JOHN HOBSON
Criminal Defense Attorney
State Bar Number 138996
12100 Wilshire Boulevard, Suite 650
Los Angeles, CA 90025

Telephone: (310) 481-6771
Email: hobsonesq@gmail.com

*Attorney for Defendant Boyao Huang, M.D.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>BOYAO HUANG, M.D.,<br><br>*Defendants.* | Case No: CR 14-512 SJO<br><br>DEFENDANT BOYAO HUANG'S SENTENCING POSITION<br><br>Estimated time for presentation: 15 minutes<br><br>Hearing Date: August 15, 2016<br>Time:  9:00 a.m.<br>Place: Courtroom 1 |

Defendant Boyao Huang, M.D. ("Dr. Huang"), by and through his counsel of record, John Hobson, hereby submits his position regarding his sentencing in this matter.

This position is based upon the following memorandum of points and authorities, the Presentence Report, the complete files and records in this case, as

1

well as any argument and evidence that may be presented at the sentencing hearing herein.

Dated:  August 1, 2016                                  Respectfully submitted,


                                                                  /s/
                                       JOHN HOBSON
                                       Counsel for Defendant
                                       Boyao Huang, M.D.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Following his conviction of four counts of healthcare fraud based on his involvement in the examination and certification of four patients of California Hospice Care ("CHC"), Dr. Huang was interviewed by the U.S. Probation Office, and a Presentence Report ("PSR") was prepared and filed as ECF No. 292. While the PSR included a summary of Dr. Huang's positions as to the correct amount-of-loss estimation under U.S.S.G. §2B1.1(b)(1) and the inapplicability of the abuse-of-trust increase of two levels pursuant to U.S.S.G. §3B1.3, the PSR did not incorporate those positions into the sentence guideline calculation. The government filed its sentencing position disputing the PSR's reduction for minimal role, among other things. (ECF 299, later re-filed as ECF 301 with certain redactions; the government's position paper will be referred to herein as ECF 301.)

### ARGUMENT

There is no dispute among the parties that the base offense level is 6 (ECF 292, ¶ 50; ECF 301, p.1, l. 15). The loss calculation in the PSR is based on the amount *billed* to Medicare and Medi-CAL by California Hospice Care rather than the amount *paid* by Medicare and Medi-CAL to California Hospice Care. While Dr. Huang was not directly involved in the billing, he was found to have falsely certified some of his CHC patients for hospice benefits.

The question is what portion of the patients was certified fraudulently as opposed to simply outliving a reasonable diagnosis. Trial testimony from Dr. Enrique Calleros, a treating physician for one of Dr. Huang's CHC patients, as well as Jean Stone, the government's Medicare expert, revealed that determining a patient's life expectancy is not an exact science. Based on that fact, it is possible for a hospice patient to outlive a prognosis of life expectancy of six months or less, even when the certifying physician is acting in good faith.

Given the above, it is reasonable to exclude those CHC patients of Dr. Huang

who passed away within a fairly short time of discharge from hospice care from the loss calculation, as such patients were unlikely to have been fraudulently diagnosed. In order to approximate the amount billed by CHC for such patients, as set forth in footnote 2 on page 12 of the PSR (ECF 292), because 31% of Dr. Huang's CHC patients died within six months of discharge from hospice, a 31% reduction in the total billed to Medicare and Medi-CAL for all Dr. Huang's patients, so as to include those who died while on hospice service and those who died within six months of hospice service may be used. Doing so yields a total loss figure of $1,247,597.70. That figure is still based on amounts billed by CHC, so it is greater than basing the figure on amounts collected by CHC. The difference is significant because it yields a two-level decrease compared to the PSR loss amount of $1,589,452.79, which only allows a reduction in the loss amount for patients who died while on service. Thus, using the loss amount that takes into account patients who died shortly after hospice service results in a 14-level increase rather than a 16-level increase. U.S.S.G. §2B1.1(b)(1)(H). A two-level increase for a federal health care offense involving a loss greater than $1,000,000 still applies.

Regarding the abuse-of-trust enhancement, the PSR applies a two-level increase for abuse of trust under U.S.S.G. §3B1.3. However, in this case, Dr. Huang certified patients for hospice benefits from Medicare based in part on charts prepared by nurses at CHC. He was presented with forms indicating that patients had elected hospice and in some cases elected "do not resuscitate" status. These forms were obtained by the CHC nurses at the time of patient intake apparently in some cases by misleading patients about the nature of the forms, or possibly forging patient signatures on the forms according to the evidence at trial.

Ordinarily, as government witness Jean Stone testified at trial, an administrative intermediary (in this case, National Government Services ("NGS")) processed the claims for payment made by CHC. Although Dr. Huang's certification of terminal illness was a necessary part of the process (along with the signature and certification

of the CHC medical director, Violeta Atiga, who was never charged with any crime in connection with her certifications) not only was he not involved in billing Medicare, but when National Government services initiated an Additional Documentation Request ("ADR") to determine whether payment of the claims by CHC was justified, CHC, *without any knowledge or participation by Dr. Huang,* falsified the patient files so as to "pass" the ADR and receive payment. Trial witness Erwin Castillo testified that entirely false patient files were created for the response to the ADR, and Dr. Huang's signature was forged for that purpose. Mr. Castillo testified that Dr. Huang was never made aware of the fact that entirely recreated false patient files were submitted to NGS in order to pass the ADR and receive payment from Medicare.

There was no evidence that Dr. Huang was unwilling to have NGS review the original patient records that had been presented to him and those patient notes created by him when he made his certifications. If in fact, the information in the original files was insufficient to support Dr. Huang's certification of terminal illness, then Medicare would not have paid the claims made by CHC. Hence, while Dr. Huang was apparently willing to rely on the ADR process taking into account the patient data that he was provided, CHC, behind his back, provided NGS with false patient files that Dr. Huang never saw or prepared. When there is such an attenuated link between the certifying physician and Medicare's payment of the claims, the abuse-of-trust enhancement should not be applied. See, *U.S. v. Garrison* 133 F.3d 831, 841-843 (11th Cir. 1998).

Lastly, regarding the minimal role reduction set forth in the PSR ¶¶ 55-58, it is important to keep in mind that Dr. Huang, unlike the other CHC physicians, was paid only for his time spent in connection with performing face-to-face examinations of the patients. He was never paid referral fees per patient per month on service as other physicians were. Dr. Huang received $300 for an his time spent on an initial examination that resulted in a patient's certification for hospice benefits, $150 for an

initial examination that did not result in certification, and $200 for subsequent examinations for re-certification.

After the initial examination resulted in certification, a subsequent exam was required 90 days later, and again after another 90 days. Thereafter, exams were required every 60 days. The exams included travel to the patients' locations, a face-to-face visit with the patient, review of the nursing assessments left at the patient locations, well as drafting a report.

Two principals from CHC testified at trial pursuant to cooperation agreements with the government. Both Sharon Patrow and Erwin Castillo testified that Dr. Huang was intentionally kept in the dark about the fraud taking place at CHC, including the paying kick-backs to those who referred patients, the falsification of patient evaluations by nurses, the wholesale fraudulent alteration of patient files by CHC employees in response to an "Additional Documentation Request" by the administrator for Medicare, as well as the fact that the Interdisciplinary Team meetings at CHC included discussions that patients were not hospice appropriate. In spite of the fact both witnesses had an incentive in their plea agreements to substantially assist the government by implicating Dr. Huang by placing him deep in their fraudulent scheme, neither did so, beyond the fact that he worked there and certified patients for hospice benefits.

While CHC received $1,344,204.56 from Medicare and Medi-CAL for patients seen by Dr. Huang who did not die while on hospice service (ECF 292, ¶43; ECF 301, p. 17, ll. 18-21), the evidence at trial established that Dr. Huang made approximately $42,200 from his work at CHC, including his time spent with patients who died while on hospice service there and spent with those who died soon afterward (Trial Exhibit 12A). Dr. Huang's earnings are grossly disproportionate to what CHC made and what each of the employees receiving kick-backs from CHC made. Also, as soon as Dr. Huang was made aware that CHC was being investigated for fraud when interviewed by law enforcement in February 2013, he disassociated

himself from CHC without telling anyone there about the investigation. In spite of Dr. Huang leaving, CHC continued to commit fraud until a search warrant was executed there sometime later. This shows that Dr. Huang was not an essential player in the fraud at CHC. CHC used him for its fraudulent purposes without ever informing him about it or compensating him extraordinarily for it. Because of his peripheral involvement and his vastly disproportionate earnings, Dr. Huang is deserving of a reduction for a minimal role under U.S.S.G. §3B1.2(a).

## CONCLUSION

Dr. Huang's involvement at CHC began in response to an advertisement on Craigslist. Dr. Huang came to CHC in 2011 as a physician who worked full time at a hospice company in Orange County known as St. Michael's. He was a good husband to his wife Fang-Fang Ho and a good father to his then 7-year-old daughter, Cassandra. He spent time helping his daughter grow academically by reading with her, artistically by taking her to music lessons, and athletically by taking her to golf a few times each week. He was a successful physician with an impeccable record and no criminal history, not even any blemish on his Department of Motor Vehicles record.

Today, as a result of his actions at CHC, he stands to lose his medical license, and with it, his livelihood. All that he would have earned as a doctor will be taken away, as well as a great portion of his past earnings from legitimate medical work, which will be paid as restitution to Medicare and Medi-CAL. His family will be deprived of his presence and his loving care for as long as the court sentences him to confinement. His life will never be the same because of his being drawn into the scheme at CHC. For a man like Dr. Huang, a little imprisonment goes a long way.

Thus, a base offense level of 6, plus a loss amount that allows for patients who died on service, or within a reasonable time of discharge from hospice service, to be excluded adds 14 levels, plus two levels for a federal health care offense loss greater than $1,000,000, less 4 levels for minimal role yields an offense level of 18, and a

sentence range of 27-33 months.

While he may not qualify strictly speaking for a downward departure based on aberrant behavior under U.S.S.G. §5K2.20, the court can still consider it under 18 U.S.C. §3553(a). Because Dr. Huang's involvement was so uniquely peripheral and because his gains were vastly disproportionate to the gains of the others at CHC, the defense requests that the court consider departing downward to a sentence of 24 months.